HENRY WAITS v. THE STATE.

No. 19415.   Delivered February 23, 1938.

The opinion states the case.

C. W. Falvey, of Lufkin, for appellant.

*Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is theft of hogs; the punishment, confinement in the penitentiary for two years.

On the 3d of March, 1937, Joe Birch lost about seven hogs, and at the same time a hog belonging to his son was taken from the same range. Touching the description of one of the hogs, Mr. Birch said: "That barrow that I lost was not a white hog but was a sort of dirty white, sandy-colored hog, with maybe a few specks on him. Those hogs at that time I guess would weigh about fifty or sixty pounds maybe, and that barrow was in my mark that I have just given to the jury." As to the hog his son had lost, he said: "My son's hog ranged with mine. My son lost one hog about that time. He was a listed gilt." The son's mark was not the same as that of his father.

Shortly after the theft, officers went into the woods near the home of appellant. There they saw appellant, his brother Gibson Waits, and J. E. White sitting around a fire on which a tub of water had been placed. About forty feet from the fire they found two hogs, weighing about sixty pounds each. One was a listed shoat and the other, a sandy-colored hog. The hogs had been shot in the head with a small rifle, and the blood indicated that they had been recently killed. Near by the officers observed a .22 rifle, and appellant's car. There was blood in the car. One of the officers testified: "We examined the car and found blood where they hauled the hogs down there." We quote further from the testimony of this officer, as follows: "The hogs that we carried to Mr. Birch were the same hogs that I cut off the heads that I carried to Joe Birch were the same heads that we cut off of the hogs that we found there behind Mrs. Allberry's the night I was down there and where we found Mr. Henry Waits and Gibson Waits and J. E. White."

When appellant's attention was called to the fact that there was blood in his car he said: "There is other reasons for the blood being in the car." However, he did not state what said reasons were.

Relative to the ownership of the tub, J. E. White stated to the officers that it belonged to his mother, and requested that it be placed where she could get it.

The officers carried the heads of the hogs to Mr. Birch, from whose testimony we quote, as follows: "I saw a head besides the head that I said was marked with my mark, and that head was in my son's mark. * * * Nobody told me whose hogs those were; I was able to identify the hogs by the marks."

The proof on the part of the State was to the further effect

that appellant was near the range where the stolen hogs ranged about the time of the theft.

Jake Wysinger testified that on the 3d of March, 1937, J. E. White borrowed a .22 caliber rifle from him. He said: "I taken it to be Henry Waits that came there with J. E. White at the time he borrowed my gun; I know Henry Waits. They came there to my place in Henry Waits' car. * * * It was that day before they found the hogs that night that I let Henry Waits and J. E. White have my gun." The gun the officers found near the bodies of the hogs was shown to be Mr. Wysinger's gun.

Testifying in his own behalf, appellant denied that he had stolen Mr. Birch's hogs. According to his version, he had gone with his brother and J. E. White into the woods to get a piece of wood to use in changing a tire on his car. When they entered the woods he heard "a noise like something running off." He observed that some one had placed a tub of water on a fire. He and his companions sat down on a log near the fire to rest. While they were there the officers approached. According to his testimony, appellant did not know the hogs were there, and stated to the officers that it looked like some one was fixing to kill hogs. Again, appellant testified as follows: "I do not know who put the tub and water there. * * * Mr. Langford found the hogs. I never did see those hogs before. I did not kill those hogs and carry them there in my car. As to where Harvey Leonard and I went on the Sunday before this I will state that on Saturday night we left to go to Schwab City, a short ways below there. Mrs. Leonard owned a place down there; that is, Harvey Leonard's mother; and they have hogs down there. We went down there and killed a couple of hogs and dressed them there. After we dressed them we put them in the car and brought them home. I got half of one of the hogs and carried it to my mother's, where I was staying."

We deem the evidence sufficient to support the conviction.

In his motion for new trial appellant alleged that a prejudiced juror sat on the jury which convicted him. He attached to the motion the affidavit of Jim Millican, in which was set out the purported declaration of a juror to the effect that he had known the appellant all of his life, and that he ought to be in the penitentiary. It appears from the affidavit that the juror made this statement shortly after the jury had been discharged. No affidavit was appended to the motion showing that the juror had been questioned on his voir dire examination as to prejudice against the appellant, and had qualified.

In the order overruling the motion for new trial there is no recital that the court heard evidence; and if evidence was heard

when the motion was submitted, such evidence has not been brought forward. With the record in this condition, the presumption is indulged that, in passing upon the motion, the affidavit appended thereto was considered by the trial court. Brown v. State, 274 S. W. 588. In short, we must presume that the affidavit of Millican was considered. Said affidavit not having been controverted, the showing that the juror was prejudiced might be sufficient. Be that as it may, the fact that there was no sufficient showing that appellant and his counsel were not lacking in diligence precludes this Court from ordering a reversal of the judgment. We quote from Branch's Ann. Texas P. C., Sec. 565, as follows: "If it is discovered for the first time after the verdict of guilty that a juror was prejudiced against defendant and the juror had qualified himself on his voir dire examination, a new trial will be granted if defendant and his counsel were not lacking in diligence and were deceived by the answers of the juror."

This Court has held that the averments in the motion for new trial, although sworn to by the appellant, do not prove themselves. On this point we quote from Waster v. State, 56 S. W. (2d) 455, as follows:

"It is averred in the motion that both the district attorney and the attorney for appellant asked questions of the juror, which, if answered truly, would have revealed his prejudice. The averments in the motion did not prove themselves. Although sworn to by appellant, the motion was only a pleading, upon which evidence might have been introduced."

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.